UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                          :

STEPHANIE GOMEZ and FRANK GUEITS,      :

                     Plaintiffs,         :

                                           :

          -v-                       :

PETPIVOT, INC., et al.,                    :

                    Defendants.       :

                                         :

------------------------------------------------------------------X

25-cv-5622 (LJL)

OPINION AND ORDER

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED:  02/24/2026              │
└─────────────────────────────────────┘
```

LEWIS J. LIMAN, United States District Judge:

      Defendants PetPivot, Inc. ("PetPivot"), Xianxue Zhou ("Zhou"), and Poppy Xie ("Xie,"

and, with PetPivot and Zhou, "Moving Defendants"), move, pursuant to Federal Rules of Civil

Procedure 12(b)(2) and 12(b)(6), to dismiss the complaint against them. Dkt. No. 14. For the

reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

      The facts of this case are not easy to recount, particularly for any pet owner.[1] They are

taken as true for purposes of this motion.

      Plaintiffs Stephanie Gomez ("Gomez") and Frank Gueits ("Gueits," and with Gomez,

"Plaintiffs") are residents of Bronx County, New York. Dkt. No. 1-1 ("Compl.") ¶¶ 6–7. The

two owned a cat named Sarabi, who was rescued from the street by Gomez. *Id.* ¶¶ 22, 36.[2]

They also own a family cat named Sebastian. *Id.* ¶ 26.

---

[1] The undersigned owns a dog.

[2] The cat is named after Queen Sarabi, the strong and dignified lioness from Disney's *The Lion King*. *Id.* ¶ 37.

PetPivot is a corporation organized under the laws of Oregon with its principal place of business in Portland, Oregon. *Id.* ¶ 8. Xie was and is Chief Executive Officer of PetPivot. *Id.* ¶ 18. Zhou was and is President of PetPivot. *Id.* ¶ 17. Defendant Amazon.Com, Inc a/k/a Amazon.com Services, Inc. d/b/a Amazon.com is a Delaware corporation with its principal place of business in Seattle, Washington and defendant Amazon Marketplace was and is a foreign C Corporation authorized to do business in New York, with its principal place of business in Seattle, Washington. Dkt. Nos. 11–12.[3]

PetPivot designs, manufactures, distributes and sells a self-cleaning litter box for cats, called the Autoscooper 11 Open-top Self-cleaning Smart Cat Litter Box, Model ACT-58TW AS11 (the "Autoscooper"). *Id.* ¶¶ 1, 9, 17–18. It distributes and sells the product through Amazon including in the Bronx, New York. *Id.* ¶¶ 2, 9, 13. The Autoscooper is marketed as a fully automated self-cleaning litter box that uses a rotating litter tray and sensor-based safety system to detect pet usage and initiate waste removal only when the unit is unoccupied. *Id.* ¶ 24. The Autoscooper features two primary components: (1) a rotating litter tray that is meant to rotate backward during usage to separate clean litter from clumps and to push solid waste into a rear waste component; and (2) an automated sensor mechanism using infrared (IR) and Hall-effect sensors intended to detect the presence of a cat and to prevent the unit from activating or continuing its cleaning cycle while a pet is nearby or inside. *Id.*

The Autoscooper is advertised as remaining partially open at all times, with no complete enclosure that could entrap a pet. *Id.* ¶ 25. On the PetPivot website, Amazon.com, and promotional materials, PetPivot marketed the Autoscooper as "smart," "safe," and "fully automated" and equipped with multiple "safety protection devices," including that the system

---

[3] Amazon.com, Inc. and Amazon Marketplace are referred to collectively as Amazon.

would automatically stop operating when a cat was inside the chamber. *Id.* ¶ 97. The Amazon listing for the PetPivot assured consumers that the device can operate safely without supervision. *Id.* ¶ 98.

In December 2024, Gomez received the Autoscooper as a Christmas gift from her mother, who had purchased the item through Amazon. *Id.* ¶¶ 23, 42. Relying on the product's marketing, Gomez believed that the device was "safe," "smart", and designed to protect cats from harm. *Id.* ¶ 23. On December 26, 2024, Gomez assembled the Autoscooper device in accordance with the manufacturer's instructions. *Id.* ¶ 26.

The tragic events of this case occurred on January 27, 2025. Gomez left for work and kissed her cats, Sarabi and Sebastian, goodbye. *Id.* ¶ 28. When she returned, Sebastian was crying in her apartment and Sarabi was lying trapped and dead in the Autoscooper. *Id.* The upper half of the cat's body was inside the machine, crushed between the rotating upper panel and the base, while her hind legs and tail hung out of the unit. *Id.* The machine remained powered on, continuing to crush the cat's body. *Id.* The machine had pinned Sarabi, crushed the life out of her, and would not let go. *Id.* ¶ 30. Gomez quickly unplugged the device to stop its motion and tried to pry open the litter box to remove Sarabi's body but the upper section of the machine remained tightly locked. *Id.* ¶ 28. The cat's body could not be easily removed. *Id.* ¶ 30. Gueits also could not bring himself to pry Sarabi out of the machine. *Id.* ¶ 33. Ultimately, that evening, Gueits contacted a pet crematorium and, at his request, a staff member from the crematorium pried Sarabi's body from the interior of the litter box at Plaintiffs' residence. *Id.* ¶¶ 31, 33, 40.

Both Plaintiffs have experienced significant emotional trauma as a result of the incident. *Id.* ¶ 34. Gomez suffers from recurring flashbacks, deep grief, insomnia, and severe and

persistent anxiety. *Id.* ¶¶ 34, 40. Gueits, who had grown deeply attached to Sarabi and witnessed the condition in which she was found, remains profoundly affected by the incident. *Id.* ¶ 34. Plaintiffs also noted changed behavior in their other cat, Sebastian; after the incident, he refused to eat, meowed constantly, and paced back and forth, mourning the loss of his companion. *Id.* ¶ 38. Gomez had to hand-feed him for weeks, trying to bring normalcy back to his life. *Id.* To this day, Sebastian sleeps on the spot where the Autoscooper had killed Sarabi. *Id.*

After Sarabi's death, Gomez's mother, Brenda, contacted Amazon and secured a full refund. *Id.* ¶ 41. In March 2025, Brenda received a handwritten letter purporting to be from Xie, extending condolences on the loss of Sarabi and offering $10,000 in compensation. *Id.* The letter stated in part:

> At PetPivot, the safety and well-being of pets are our top priorities. We are conducting a thorough internal investigation to understand the circumstances surrounding this incident and to prevent such occurrences in the future.
>
> As a small startup, we are committed to taking full responsibility and supporting you during this difficult time. We would like to offer you a compensation of $10,000 as a gesture of our sincere apologies and sympathy.

*Id.* ¶ 44. There was no letterhead with an address or phone number on the letter. *Id.*

Plaintiffs allege that PetPivot and Amazon are and were aware that the product suffered from sensor failure and dangerous defects, but continue to market and distribute the Autoscooper and to profit from the sales of the product, without issuing recalls, modifying the design, or providing appropriate warnings. *Id.* ¶ 45. Plaintiffs further allege that none of the advertised safety sensors on the Autoscooper functioned as promised and the product continued to operate with a cat inside, despite representations that the product would automatically stop if motion or presence was detected. *Id.* ¶ 48.

## PROCEDURAL HISTORY

Plaintiffs initiated this case by complaint filed in New York State Supreme Court, Bronx County on June 9, 2025.  Dkt. No. 1 ¶ 1; Dkt. No. 1-1.  The Complaint asserts five causes of action: (1) strict products liability for defective design, Compl. ¶¶ 50–92; (2) strict products liability for failure to warn, *id.* ¶¶ 93–119; (3) strict products liability for manufacturing defect, *id.* ¶¶ 120–144; (4) deceptive acts and false advertising in violation of New York General Business Law ("GBL"), N.Y. Gen. Bus. L. §§ 349, 350, *id.* ¶¶ 145–165; and (5) negligent infliction of emotional distress ("NIED"), *id.* ¶¶ 166–180.  Plaintiffs seek compensatory and punitive damages and attorneys' fees and costs.  *Id.* at 44–45.

On July 8, 2025, Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446, invoking diversity jurisdiction under 28 U.S.C. § 1332.  Dkt. No. 1.

On August 28, 2025, Amazon filed an answer, affirmative defenses, and cross-claims to Plaintiffs' complaint.  Dkt. No. 13.

On August 28, 2025, Moving Defendants filed this motion to dismiss for lack of personal jurisdiction and to dismiss counts four and five, along with the affidavits of Xie and Zhou.  Dkt. No. 14.  On September 8, 2025, Plaintiffs filed a memorandum of law in opposition to the motion to dismiss.  Dkt. No. 18.  On September 15, 2025, Moving Defendants filed a reply memorandum of law in further support of the motion to dismiss.  Dkt. No. 21.[4]

## STANDARD OF REVIEW

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question" and must dismiss the action against any defendant over whom it lacks personal jurisdiction.  *Lugones v. Pete & Gerry's*

---

[4] On consent of the parties, discovery in this case has been stayed pending a decision on the motion to dismiss.  Dkt. No. 20.

*Organic, LLC*, 2020 WL 871521, at *2 (S.D.N.Y. Feb. 21, 2020) (*citing Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)); *see* Fed. R. Civ. P. 12(b)(2); *N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2020 WL 2521448, at *2 (S.D.N.Y. May 18, 2020).

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Where, as here, jurisdictional discovery has not been conducted, the plaintiff need only make a prima facie showing by his pleadings and affidavits that jurisdiction is proper. *Id.* at 85; *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012). "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) (quoting *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990) (per curiam) (citation omitted)). The court must "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in [its]

favor." *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 131 (2d Cir. 2022) (quoting *DiStefano*, 286 F.3d at 84).

Even so, the prima facie showing required to establish personal jurisdiction prior to an evidentiary hearing still "must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec.*, 722 F.3d at 85. While the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id.*, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quotations omitted). "[C]onclusory allegations are not enough to establish personal jurisdiction." *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 625 (S.D.N.Y. 2003) (quoting *Marczeski v. Kamba*, 2001 WL 237204, at *1 (D. Conn. Feb. 23, 2021)), aff'd, 355 F.3d 206 (2d Cir. 2004); *accord Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*, 763 F. Supp. 3d 618, 632–33 (S.D.N.Y. 2025); *Megna v. Biocomp Labs. Inc.*, 166 F. Supp. 3d 493, 496–97 (S.D.N.Y. 2016).

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Moving Defendants argue that the Complaint should be dismissed for lack of personal jurisdiction over the Individual Defendants and for failure to state a claim for relief pursuant to GBL or for NIED.[5] Moving Defendants further argue that the Court should dismiss Plaintiffs' request for non-economic damages from the loss of Sarabi, attorneys' fees and costs, and punitive damages. Dkt. No. 14 at 1–2.

## I.    Motion to Dismiss for Lack of Personal Jurisdiction

"[T]he Court engages in a 'two-step analysis' to determine personal jurisdiction over a non-domiciliary." *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 362 (S.D.N.Y. 2020). "First, the Court applies the forum state's long-arm statute." *Id.* (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). "If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Id.* (citing *Chloe*, 616 F.3d at 164).

New York's long-arm statute provides, in relevant part:

---

[5] Moving Defendants originally moved for the Court to dismiss PetPivot for lack of personal jurisdiction. Dkt. No. 14 at 1–2, 4–7. Moving Defendants, however, do not respond to Plaintiff's argument that the Court may exercise personal jurisdiction over PetPivot under CPLR 302(a)(1) and 302(a)(3)(ii). Dkt. No. 21. Accordingly, the Court considers PetPivot's argument that the Court lacks personal jurisdiction over it to be abandoned. *See Horsting v. St. John's Riverside Hospital*, 2018 WL 1918617, at *6 (S.D.N.Y. Apr. 18, 2018).

(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

. . .

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

      (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

      (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;

N.Y. C.P.L.R. § 302(a).  Plaintiffs argue that there is specific personal jurisdiction over the Individual Defendants under C.P.L.R. 302(a)(1) and 302(a)(3)(ii).[6]

"To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006).  Transacting business under Section 302(a)(1) requires "purposeful activity"—that is, "volitional acts" through which a defendant "avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 7 (N.Y. 2016) (citation omitted).  The Second Circuit has held that "Section 302 is a single act statute" such that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a

---

[6] Plaintiffs do not assert general personal jurisdiction under C.P.L.R. 301.

substantial relationship between the transaction and the claim asserted." *Chloe*, 616 F.3d at 170.

Thus, in *American Girl, LLC v. Zembrka*, the Circuit held that personal jurisdiction existed even

where no products had been shipped into New York, as the defendant "accepted orders with New

York shipping addresses, sent confirmatory emails with New York shipping addresses containing

commitments to ship to those New York addresses, and accepted payments from a customer with

a New York address." 118 F.4th 271, 277 (2d Cir. 2024).

At the same time, "[e]ven the existence of an interactive 'patently commercial' website

that can be accessed by New York residents is not sufficient to justify the exercise of personal

jurisdiction unless some degree of commercial activity occurred in New York." *Alibaba Grp.*

*Holding Ltd. v. Alibabacoin Found.*, 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018)

(quoting *ISI Brands, Inc. v. KCC Int'l, Inc.*, 458 F. Supp. 2d 81, 87–88 (E.D.N.Y. 2006)).

Indeed, it "stretches the meaning of 'transacting business' to subject defendants to personal

jurisdiction in any state merely for operating a website, however commercial in nature, that is

capable of reaching customers in that state, without some evidence or allegation that commercial

activity in that state actually occurred." *Savage Universal Corp. v. Grazier Const., Inc.*, 2004

WL 1824102, at *9 (S.D.N.Y. Aug. 13, 2004) (Lynch, J.).

In addition to C.P.L.R. 302(a)(1), Plaintiffs allege that jurisdiction lies under C.P.L.R.

302(a)(3)(ii). To establish personal jurisdiction under C.P.L.R. 302(a)(3)(ii), a plaintiff must

allege that "(1) the defendant committed a tortious act outside New York; (2) the cause of action

arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4)

the defendant expected or should reasonably have expected the act to have consequences in New

York; and (5) the defendant derived substantial revenue from interstate or international

commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 162 (N.Y. 2011).

Plaintiffs seek to establish personal jurisdiction over Zhou and Xie based on their roles as corporate officers of PetPivot and PetPivot's alleged activity in designing and manufacturing the Autoscooper and marketing and selling it in New York.  Dkt. No. 18 at 7–9.  However, even assuming PetPivot's activities are sufficient to establish jurisdiction under either 302(a)(1) or (a)(3), the acts of PetPivot are not automatically imputed to its corporate officers for purposes of personal jurisdiction.  *See In re Lyman Good Dietary Supplements Litigation*, 2018 WL 3733949, at *8 (S.D.N.Y. Aug. 6, 2018) ("It is 'well established that individual officers and employees of a corporation are not automatically subject to personal jurisdiction . . . simply because a court can exercise jurisdiction over the corporation." (quoting *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 180–81 (S.D.N.Y. 1995))).  Plaintiffs must establish that PetPivot's activities in New York are properly imputed to Zhou and Xie.

The New York long-arm statute authorizes personal jurisdiction over a non-domiciliary who meets the established requirements either "in person or through an agent."  C.P.L.R. 302(a). The New York Court of Appeals has established that an out-of-state corporate officer who has not personally transacted business in New York may still be subject to personal jurisdiction under New York's long-arm statute if the officer "exercised some control" over the corporation's "purposeful activities" in the state.  *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).  Although *Kreutter* only discussed C.P.L.R. 302(a)(1), "this agency theory of personal jurisdiction applies to the entire long-arm statute."  *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 336 (S.D.N.Y. 2000); *see also Chloe*, 616 F.3d at 164 ("Section 302(a) also confers jurisdiction over individual corporate officers who supervise and control an infringing activity.");  *Kinetic Insts., Inc. v. Lares*, 802 F. Supp. 976, 984

(S.D.N.Y. 1992) ("*Kreutter* made clear that its holding applied to the entire long-arm statute" (citing *Kruetter*, 522 N.E.2d at 44)).

To establish personal jurisdiction over a corporate officer based on the corporation's activities, a plaintiff "need not establish a formal agency relationship between defendants and [the corporation] . . . [She] need only convince the court that [the corporation] engaged in purposeful activities in this State in relation to [plaintiff's] transaction for the benefit of and with the knowledge and consent of the [individual] defendants and that they exercised some control over [the corporation] in the matter." *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 323 (S.D.N.Y. 1998) (Sotomayor, J.) (alterations in original) (quoting *Kreutter*, 522 N.E.2d at 44). "At the heart of this inquiry is whether the out-of-state corporate officers were 'primary actor[s] in the transaction in New York' that gave rise to the litigation, and not merely 'some corporate employee[s] . . . who played no part in it.'" *Id.* (quoting *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988)); *see Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (The Court may exercise "jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident [individual].'" (quoting *Grove Press, Inc. v. Angelton*, 649 F.2d 121, 122 (2d Cir. 1981))). The plaintiff must make allegations of control beyond a defendant's title or position within the corporation. *Kinetic Instruments*, 802 F. Supp. at 984 ("[A] corporation is not necessarily the agent of a corporate officer simply by virtue of the officer's position with the company."); *see, e.g., Chloe*, 616 F.3d at 162 (finding sufficient allegations of control for personal jurisdiction where an officer "shared in the profits from the bags [the corporate defendant] sold, had joint access to the [the corporate defendant's] bank account, used [the corporate defendant's] revenue to pay his . . . rent, and shared in the

decision-making and execution of the purchase and sale of handbags"); *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016) (district court did not err in imputing corporation's contacts to individual defendant who was "its founder and CEO, and [] exercised extensive control over [the corporation's] day-to-day activities," as shown by record evidence that "no one made any final decisions other than [individual defendant].").

Plaintiffs have not alleged that either Zhou or Xie exercised sufficient control over PetPivot to establish personal jurisdiction based on its activities in New York. Plaintiffs solely allege that Zhou is the President of PetPivot and serves as the agent for PetPivot, Compl. ¶ 17, and that Xie is the Chief Executive Officer of Petpivot, *id.* ¶ 18. An individual defendant's leadership role within a corporation is insufficient, on its own, to establish the requisite control over a corporation's activities. *See King Cnty., Wash. v. IKB Deutsche Industriebank, AG*, 769 F. Supp. 2d 309, 320–21 (S.D.N.Y. 2011) (plaintiffs do not establish personal jurisdiction over individual defendants where "[a]side from the mere fact of their positions within the corporation, plaintiffs do not offer any evidence to indicate that either [individual] exercised control over IKB's activities in New York."); *Karabu*, 16 F. Supp. 2d at 324 ("control cannot be shown based merely upon a defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation."). Plaintiffs must allege either (1) that the Individual Defendants controlled all day-to-day operations of the company, such that all of PetPivot's operations, including the sale of product into New York, could be imputed to the Individual Defendants, *see EMI Christian Music Grp.*, 844 F.3d at 98 (because CEO of corporate defendant "exercised extensive control over MP3tunes's day-to-day activities . . . it was appropriate for the District Court to consider the scope of MP3tunes's activities in New York in evaluating whether it could exercise personal jurisdiction over [CEO]."); or (2), if the Individual Defendants did not

exercise complete control over PetPivot, that the Individual Defendants at least exercised direct control over PetPivot's activities giving rise to personal jurisdiction. Thus, to establish personal jurisdiction under C.P.L.R. 302(a)(1) based on PetPivot's activities, Plaintiffs must allege that the Individual Defendants directly contributed to the decision to sell the Autoscooper in New York. *See Chloe*, 616 F.3d at 169 (corporation's activities could be imputed to corporate employee who, *inter alia*, "shared in the decision-making and execution of the purchase and sale of handbags."). Or, to establish personal jurisdiction under C.P.L.R. 302(a)(3), Plaintiffs must allege that Individual Defendants exercised control over PetPivot in regard to each element: PetPivot's tortious conduct outside of the state, in this case the design and manufacture of a defective product, its activities giving rise to an expectation of consequences from that tortious conduct in New York, and its derivation of substantial revenue from interstate or international commerce. *See* N.Y. C.P.L.R. 302(a)(2); *N. Fork Partners*, 2020 WL 6899486, at *11 (noting that "a corporation's substantial revenue from interstate or international commerce" is not necessarily imputed "to the corporation's non-shareholding officers" for personal jurisdiction). Individual Defendants' roles as corporate officers is insufficient to establish this control.

Xie's letter to Gomez's mother following the incident does not supply evidence of control over PetPivot's day-to-day activities or its decision to sell product in New York. In the letter, Xie stated that "We are heartbroken to learn about the loss of your beloved cat" and "devastated that one of our products may have been involved in this tragedy," noting that PetPivot would conduct a thorough internal investigation and offering $10,000 in compensation. Compl. ¶ 44. The letter does not illuminate whether Xie had any involvement in the sale of the Autoscooper into New York or whether she otherwise exercised control over any aspect of PetPivot's operations—indeed, it provides no information about Xie's role within PetPivot

beyond her ability to act on behalf of the company when complaints arise.  *Cf. Sirius XM Radio Inc. v. Aura Multimedia Corp.*, 2022 WL 18587769, at *4 (S.D.N.Y. July 18, 2022), *report and recommendation adopted*, 2023 WL 243615 (S.D.N.Y. Jan. 17, 2023) (finding personal jurisdiction based on corporate defendant's activities in New York where, *inter alia*, individual defendant "signed the agreements [with New York-based Sirius] on behalf of [corporate defendant], was the "sole owner" of the corporation, and "was the 'point person' for [the corporate defendant's] relationship with Sirius.").

Plaintiffs solely allege that Zhou and Xie are corporate officers of PetPivot, an Oregon corporation, and that Xie wrote a letter to Gomez's mother.[7]  The letter, as quoted above, does not indicate that Xie transacts business in New York or in any way contributed to the sale or distribution of the Autoscooper into New York.  Compl. ¶ 44.  Plaintiffs do not even allege in the Complaint that Gomez's mother, to whom the letter was sent, resides in New York.  Even if Plaintiffs alleged that Xie sent the letter to New York, a single letter regarding the Autoscooper sent after the incident and upon which the claim does not arise is insufficient to establish personal jurisdiction over Xie.  *See Withelmshaven Acquisition Corp. v. Asher*, 810 F. Supp. 108,

---

[7] Plaintiffs also argue that the Court has jurisdiction over Zhou because he "repeatedly used a false 'principal place of business' [in Portland, Oregon] . . . for corporate and trademark filings, evading service and concealing operations."  Dkt. No. 18 at 11.  Plaintiffs allege "[t]here are issues of possible corporate abuses directed by Zhou and Xie" such that liability should pierce the corporate veil.  *Id.* at 12.  Plaintiffs provide no authority for the proposition that "possible corporate abuses" in Oregon create a ground for personal jurisdiction in New York.  Plaintiffs further assert these facts for the first time in opposition to the motion to dismiss.  Though a court "may consider affidavits and other materials beyond the pleadings" when assessing a motion to dismiss for lack of personal jurisdiction, *Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir. 2024), these allegations do not support a finding of personal jurisdiction.  To the extent Plaintiff seeks to add a veil-piercing claim, "[i]t is well-settled a plaintiff may not 'assert[] new facts or theories for the first time in opposition to' a motion to dismiss."  *Indiviglio v. B&G Foods, Inc.*, 2023 WL 9022866, at *7 (S.D.N.Y. Dec. 29, 2023) (quoting *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013)).  The Court accordingly disregards these allegations.

112 (S.D.N.Y. 1993) (finding that correspondence, telephone calls, and telefax transmissions regarding contract negotiations did not provide a basis for jurisdiction under C.P.L.R. 302(a)(1)). Plaintiffs' allegations regarding Zhou and Xie's direct activities are limited to their positions at PetPivot and Xie's actions in writing a letter offering condolences and compensation to Gomez's mother.  These allegations are insufficient to establish personal jurisdiction over Zhou or Xie under either 302(a)(1) or (a)(3).

   Plaintiffs contend that to the extent they have failed to establish personal jurisdiction over the Individual Defendants, the Court should permit jurisdictional discovery.  "Where a plaintiff fails to establish a *prima facie* case that a court has jurisdiction over a defendant, it is within a court's discretion whether to allow jurisdictional discovery." *Togut v. Forever 21, Inc.*, 285 F. Supp. 3d 643, 648 (S.D.N.Y. 2018) (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 186 (2d Cir. 1998)).  Discovery is typically warranted where the Plaintiff can make out a "colorable claim of jurisdiction." *Regenlab USA LLC v. Estar Techs. Ltd.*, 2017 WL 3601304, at *4 (S.D.N.Y. Aug. 17, 2017); *see also Parker v. Bursor*, 2024 WL 4850815, at *4 (S.D.N.Y. Nov. 21, 2024) ("A court has discretion to permit jurisdictional discovery where the plaintiff has raised a genuine issue of jurisdictional fact").  A court generally should allow a plaintiff "an opportunity to conduct discovery on . . . jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party." *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004); *see also A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 575 (E.D.N.Y. 2011) (citation omitted) ("Pre-motion discovery should be permitted where the facts necessary to establish personal jurisdiction . . . lie exclusively within the defendant's knowledge.").  "A party seeking jurisdictional discovery . . .

bears the burden of showing necessity." *Molchatsky v. United States*, 778 F. Supp. 2d 421, 438 (S.D.N.Y. 2011), *aff'd*, 713 F.3d 159 (2d Cir. 2013).

Jurisdictional discovery is not warranted here. Plaintiffs have not asserted a "colorable claim of jurisdiction" over the Individual Defendants. Plaintiffs rely solely on Zhou and Xie's positions as corporate officers and Xie's actions in sending a letter to Gomez's mother. These allegations are insufficient to raise a question of jurisdictional fact.

The Complaint is therefore dismissed with prejudice as to Zhou and Xie. The Court proceeds to the motion to dismiss pursuant to Rule 12(b)(6) as to PetPivot.

## II.    Motion to Dismiss for Failure to State a Claim

### A.    NY General Business Law

Section 349 of the GBL prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). Section 350 prohibits "[f]alse advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state." *Id.* § 350. "'False advertising' includes 'advertising, including labeling, of a commodity, . . . if it is misleading in a material respect.'" *Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 461 (S.D.N.Y. 2020) (quoting N.Y. Gen. Bus. L. § 350-a(1)). To sustain a claim under either section, "a plaintiff must allege: (1) that the defendant's acts were consumer oriented, (2) that the acts or practices are deceptive or misleading in a material way, and (3) that the plaintiff has been injured as a result." *Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 675 (S.D.N.Y. 2021). A deceptive act or practice is one "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 745 (N.Y. 1995); *see also Michelo v. Nat'l Collegiate Student Loan Trust 2007-2*, 419 F. Supp. 3d 668, 701 (S.D.N.Y. 2019) (quoting *Oswego*, 647 N.E.2d at 745). "[A] plaintiff must prove

'actual' injury to recover under the statute, though not necessarily pecuniary harm." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) (quoting *Oswego*, 647 N.E.2d at 745); *see Michelo*, 419 F. Supp. 3d at 706–07 ("Courts have 'recognize[d] several types of harm which might be cognizable as a legal injury, such as physical, emotional, pecuniary or reputational harm, or the impairment of a recognized legal right.'" (quoting *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 360 (S.D.N.Y. 2016)); *Douyon v. N.Y. Medical Health Care, P.C.*, 894 F. Supp. 2d 245, 264 (S.D.N.Y. 2012); *Rozier v. Financial Recovery Sys., Inc.*, 2011 WL 2295116, at *3, 5 (E.D.N.Y. June 7, 2011).

A plaintiff need not allege that she purchased defendant's product in reliance on a misrepresentation or omission to state a claim under §§ 349 and 350. *See Stutman*, 731 N.E.2d at 613. Sections 349 and 350 require proof of causation but not "proof of justifiable reliance." *Oswego*, 647 N.E.2d at 745. "Reliance and causation, while 'twin concepts', are not identical. Reliance is the causal link between an alleged deceptive practice and a consumer's decision to transact business with the defendant, whereas causation refers to the link between an alleged deceptive practice and an actual injury sustained by a consumer as a result of such practice." *Morrissey v. Nextel Partners, Inc.*, 22 Misc.3d 1124(A), 2009 WL 400030, at *5 (Sup. Ct., Albany Cnty. Feb. 19, 2009) (internal citation omitted). Thus, for example, in *Boateng v. BMW of North America, LLC*, plaintiff brought a claim under GBL § 349 arguing that the omission of information regarding the risks of BMW's "soft close" door feature on their cars was a deceptive business practice. 2025 WL 3134521, at *1 (2d Cir. Nov. 10, 2025) (summary order). Plaintiff was injured by the car door when the automatic "soft close" feature activated, amputating a portion of his thumb. Plaintiff "was not specifically made aware of the soft close feature in the process of purchasing his car." *Id.* at *3. The jury awarded plaintiff damages for his past loss of

earnings and past and future pain and suffering. *Id.* at *1. The Second Circuit rejected defendant's argument that plaintiff had not established causation and sustained the verdict in favor of plaintiff on the alternative grounds that the jury could have reasonably found either that plaintiff would not have purchased his car or he "would have taken additional care to avoid the specific dangers posed by such doors" if defendants had adequately informed him of the serious risk of injury the soft close doors presented. *Id.*; *cf. Small v. Lorillard Tobacco Co., Inc.*, 720 N.E.2d 892, 898 (N.Y. 1999) (suggesting that plaintiffs could have established injury from defendants' misrepresentations regarding the addictiveness of nicotine if they claimed injury due to their addiction or other adverse health outcomes).

Moreover, "'[t]here is no requirement of privity, and victims of indirect injuries are permitted to sue under the Act.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.*, 175 F. Supp. 2d 593, 631 (S.D.N.Y. 2001) (quoting *Vitolo v. Dow*, 634 N.Y.S.2d 362, 366–67 (Sup. Ct., Richmond Cnty. 1995), *aff'd in relevant part*, 651 N.Y.S.2d 104 (2d Dept 1996)). "While the typical case under section 349 generally involves claims arising directly out of a commercial transaction, neither the text of the statute nor the case law establishes this requirement." *Id.* at 630–31. "[A]ny person who has been injured by reason of any violation of [section 349] may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." GBL §§ 349(h); *see* N.Y. Gen. Bus. L. § 350-e (conferring private right of action to "[a]ny person who has been injured by reason of any violation"). Courts have given effect to the statutes' broad application. In *Steele-Warrick*, for example, incarcerated plaintiffs brought claims under GBL § 349 alleging injury in the form of disciplinary action resulting from false-positive drug tests, alleging that the urinalysis company misrepresented the accuracy of

their tests to the Department of Corrections and Community Supervision.  677 F. Supp. 3d at

116.  The court concluded that the plaintiffs alleged causation, even though they did not purchase

the testing kits and were not personally aware of the misrepresentations.  *Id.*; *see Vitolo v. Dow*

*Corning Corp.*, 634 N.Y.S.2d at 366–67 (plaintiff doctor stated a claim under GBL where he

suffered reputational and economic loss due to patient-filed lawsuits stemming from defendants'

misrepresentations regarding the safety and effectiveness of silicone breast implants); *see id.* at

366 ("The definition of 'person' is much broader than 'consumer,' embracing all possible

plaintiffs, including business persons."); *see also Grp. One Ltd. v. GTE GmbH*, 625 F. Supp. 3d

28, 67 (E.D.N.Y. 2022) (noting that both Section 349 and 350 "allow[] recovery by

non-consumers [such as a business competitor] if there is 'some harm to the public at large.'").

The elements of a claim under GBL §§ 349 and 350 are intentionally broad—it is "a broad,

remedial statute and [] the provision creating a private right of action employs expansive

language."  *Blue Cross*, 818 N.E.2d at 1144.

Defendants argue that Plaintiffs fail to state a violation of GBL §§ 349 and 350 because

they do not sufficiently allege that Defendants' deceptive practices caused their injury.

Defendants argue that the complaint is deficient because Plaintiffs do not allege what materials

they saw prior to purchase.  Dkt. No. 14 at 8 n.3.  Defendants do not contest that Plaintiffs

sufficiently alleged that Defendants' actions were consumer-oriented and deceptive or

misleading in a material way.

Defendants misunderstand the nature of Plaintiffs' claim.  Plaintiffs do not claim that

they relied on Defendants' representations in purchasing the Autoscooper.  They claim that

Defendants promoted the Autoscooper "as a highly safe, intelligent, and convenient product,"

that Defendants' statements conveyed "the clear and unqualified impression"  that the

Autoscooper "was not only safe and reliable but specifically engineered to detect a cat's presence and prevent any risk of injury during use," and that "Gomez relied on these representations when accepting and using the product in her home." Dkt. No. 1-1 ¶¶ 150–42, 159; *see also* Dkt. No. 18 at 14 (arguing that causation is pled because Plaintiffs plead Gomez's reliance on Defendants' assurances "in using the product as intended, and the resulting injury in New York: Sarabi's death and Plaintiffs' consequential harms"). Gomez suffered injury as a result of Defendants' misrepresentations. She "used the product exactly as intended and represented" and "[a]s a direct result of that reliance, her cat was tragically and gruesomely killed." Dkt. No. 1-1 ¶ 159. Among her injuries, she suffered "the loss of her beloved cat." *Id.* ¶ 161.

Plaintiffs' allegations state a claim for relief. Plaintiffs allege a "connection between the misrepresentation and . . . harm from, or failure, of, the product." *Small*, 720 N.E.2d at 897. As a result of Defendants' misrepresentations, she left her cat alone with the Autoscooper in operation and because she did so, she lost her cat. "Plaintiffs need not additionally allege that they would not . . . have entered into [a] transaction" to purchase the Autoscooper to state a claim under New York's consumer fraud statutes. *Stutman*, 731 N.E.2d at 613. It is sufficient that the misrepresentation caused her to engage in an act (using the Autoscooper to clean her cat's litter) that caused her injury. It also is not necessary that Plaintiffs have been in privity with Defendants. They do not allege injury from the purchase of the Autoscooper but from its use. They easily fit into the category of "any person" injured by reason of a violation of sections 349 and 350.

PetPivot also argues that the complaint should be dismissed because "Plaintiffs do not identify what specific materials Ms. Gomez saw and when." Dkt. No. 14 at 8. PetPivot's argument reflects the heightened pleading requirement of Federal Rule of Civil Procedure 9(b),

which requires fraud claims be pled with particularity.  Fed. R. Civ. P. 9(b).  However, "[c]laims

under § 349 and § 350 are 'not subject to the pleading-with-particularity requirements of Rule

9(b)' and 'need only meet the bare-bones notice-pleading requirements of Rule 8(a).'" *Davis v.*

*Angelcare USA, LLC*, 727 F. Supp. 3d 99, 140 (D. Conn. 2024) (quoting *Manchanda v. Navient*

*Student Loans*, 2020 WL 5802238, at *5 (S.D.N.Y. Sept. 29, 2020)); *accord Pelman ex rel.*

*Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005); *Greene v. Gerber Prods. Co.*,

262 F. Supp. 3d 38, 67 (E.D.N.Y. 2017); *Yuille v. Uphold HQ Inc.*, 686 F. Supp. 3d 323, 343

(S.D.N.Y. 2023).  Plaintiffs identify a number of statements regarding safety on the official

Amazon.com product listing created by Defendants and on the PetPivot website.  Dkt. No. 1-1 ¶¶

150–51.  They also allege that Gomez relied on Defendants' representations "when accepting

and using the product in her home."  *Id.* ¶ 159.  Little more than a month passed between

Gomez's receipt of the Autoscooper as a Christmas gift from her mother in December 2024 and

the Autoscooper incident on January 27, 2025.  *Id.* ¶¶ 23, 28.  Plaintiffs have satisfied the notice

pleading requirements of Rule 8(b). [8]

---

[8] The cases relied upon by Moving Defendants are inapposite.  In each, the plaintiff claimed
injury from relying on defendants' misrepresentations in purchasing a product and the court
dismissed the complaints, in part, for failure to allege that the plaintiff saw the allegedly
misleading representation before making a purchase decision.  *See Grossman v. GEICO Cas.*
*Co.*, 2022 WL 1656593, at *3 (2d Cir. May 25, 2022) ("Plaintiffs do not allege that they saw
GEICO's advertisements … before they chose to renew their insurance policies"); *Dewey v. Big*
*Lots, Inc.*, 635 F  Supp. 3d 205, 215 (S.D.N.Y. Oct. 12, 2022) (dismissing complaint because it
failed to plausibly allege that plaintiff saw the misleading representation before making a
specific purchase decision);  *Zachmann v. Coleman Co. Inc.* 2022 WL 161480, at *4 (S.D.N.Y.
Jan. 18, 2022) (plaintiffs nowhere state that they saw misleading statements before their
purchases); *Turk v. Rubbermaid Inc.*, 2022 WL 836894, at *9 (S.D.N.Y. Mar. 21, 2022)
(dismissing complaint on alternative basis that plaintiffs failed to allege that they saw
advertisements before making purchase decision).  However, while allegations that the plaintiff
saw a misleading statement and relied on it in making a purchase decision are sufficient to satisfy
the causation requirement, they are not necessary.  *See Fishon v. Peloton Interactive, Inc.*, 620 F.
Supp.3d 80, 100 (S.D.N.Y. 2022) (citing cases), *vacated on other grounds*, 2025 WL 1284718
(S.D.N.Y. May 2, 2025).  In this case, Plaintiffs do not allege injury from the purchase of the

**B.    NIED**

Under New York law, a plaintiff alleging NIED must show: "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." *Truman v. Brown*, 434 F. Supp. 3d 100, 122 (S.D.N.Y. 2020) (quoting *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 297 (S.D.N.Y. 2015)). "These requirements, especially that of extreme and outrageous conduct, 'are rigorous and difficult to satisfy.'" *Moraes v. White*, 571 F. Supp. 3d 77, 104 (S.D.N.Y. 2021) (quoting *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). "[A] plaintiff must allege conduct that is 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Goldstein v. Mass. Mut. Life. Ins. Co.*, 875 N.Y.S.2d 53, 55 (1st Dep't 2009)).

A plaintiff may recover for NIED under one of two theories: (1) the "bystander theory" or (2) the "direct duty theory." *Wahlstrom v. Metro-N. Commuter R. Co.*, 89 F. Supp. 2d 506, 531 (S.D.N.Y. 2000) (citation omitted); see also *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). A plaintiff may recover for a purely emotional injury under the "bystander" theory, also known as the "zone of danger" rule, when he is threatened with physical harm as a result of defendant's negligence and consequently suffers emotional injury from witnessing the death or serious bodily injury of a member of his immediate family. *Mortise*, 102 F.3d at 696; *Greene v. Esplanade Venture P'ship*, 168 N.E.3d 827, 828 (N.Y. 2021) (noting that the bystander theory relies on the "zone of danger" rule). A plaintiff may recover under the "direct duty theory for an emotional injury from the defendant's breach of a duty that unreasonably endangered plaintiff's own physical safety." *Id.* Physical injury is not a necessary element of a NIED claim, but an

product but from its use and allege that they relied on Defendants' misrepresentations in that use.

NIED claim "generally must be premised on conduct that unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for his or her physical safety." *Johnson v. N.Y.C. Bd. of Educ.*, 704 N.Y.S.2d 281, 283 (2d Dep't 2000).

Defendants argue that Plaintiffs have failed to state a claim for NIED because a pet is not an immediate family member and neither Plaintiff was threatened with physical harm. Dkt. No. 14 at 10–11. Plaintiffs argue that a cat can be considered a family member under New York law and that Gomez was within the zone of danger because she "witness[ed] her beloved cat, Sarabi, being violently crushed by the Autoscooper, and then ha[d] to intervene, directly exposing herself to the same dangerous mechanical parts that had just killed her cat." Dkt. No. 18 at 16. Plaintiffs do not argue that Gueits was threatened with physical harm. *Id.* at 16–19.

As the New York Court of Appeals has acknowledged, "every injury has ramifying consequences, like the rippling of waters, without end" but courts must "limit the legal consequences of wrongs to a controllable degree." *Trombetta v. Conkling*, 626 N.E.2d 653, 656 (N.Y. 1993). To create these limits, New York courts limit recovery under a bystander theory of NIED to circumstances involving the death or serious injury of an immediate family member. *Id.* Though the Court of Appeals consistently declines "to define the 'outer limits' with respect to 'the immediate family' element," the court recently applied the definition of "immediate family" beyond relationships in the first degree for the first time in *Greene v. Esplanade Venture Partnership*, allowing a grandmother to pursue a claim for bystander recovery following the tragic death of her grandchild. 168 N.E.3d at 828, 833. The court relied on the "legislative recognition of the changing nature of society's understanding of family and the special relationship between grandparents and grandchildren," noting the 2003 amendment of the New York Domestic Relations Law that provides "that grandparents may demonstrate standing to

seek custody [of their grandchildren] based on extraordinary circumstances." *Id.* at 833–34

(quoting *Matter of Suarez v. Williams*, 44 N.E.3d 915, 916 (N.Y. 2015)). The court recognized

that "concepts of the creation and composition of family units have evolved beyond traditional

legal notions of blood relation or consanguinity," *id.* at 834, and "simply conclude[d] that a

grandchild is within our understanding of what is meant by 'immediate family,'" *id.* at 835.

The court emphasized that its decision is consistent with its earlier holding in *Trombetta*,

where the court declined to expand "immediate family" to include the relationship between aunts

and uncles and their nieces and nephews. *Id.* The court's determination there, as in *Greene*,

"was borne not of an investigation into the nature of the bond between the decedent and the

plaintiff, but of our historical precision and prudence in this area." *Id.* In other words, the

inquiry is objective; it asks not whether the grandmother and her grandchild had an exceptionally

close bond, but whether New York law has evolved to recognize grandparents as a "discrete,

limited class of persons that enjoys a special status under modern New York family law." *Id.*

Plaintiffs argue that *Greene* paved the way for an expansion of "immediate family" and

rely on a decision from the New York State Supreme Court for Kings County where the judge

found that a pet dog could be classified as "immediate family." Dkt. No. 18 at 18 (citing

*DeBlase v. Hill*, 239 N.Y.S.3d 770, 778–79 (Sup. Ct., Kings Co. 2025)). In *DeBlase*, the court

applied the factors relied upon in *Greene*—"legal recognition of the special status of

grandparents, shifting societal norms, and common sense"—to determine that a "beloved

companion pet" fell within the category of "immediate family." 239 N.Y.S.3d at 789. The

court, however, emphasized that its holding was dependent on "*the fact pattern presented by

Plaintiffs*." *Id.* (emphasis in original).

The court in *DeBlase* found that "New York's legal framework concerning household pets has significantly evolved from treating them as mere property." *Id.* at 789. New York Domestic Relations Law ("DRL") requires a "best interest" framework for determining the custody of pets, similar to the framework for children, in recognition "that 'for many families, pets are the equivalent of children and must be granted more consideration by courts to ensure that they will be properly cared for after a divorce.'" *Id.* at 789 (quoting NY Committee Report, 2021 NY Senate Bill No. 42248 (Feb. 6, 2021)); *see* Dom. Rel. L. § 236 (B)(5)(d)(15). The court further noted changes in societal norms regarding pets in hotel rooms and on planes, and concluded that "considering the various accommodations made for companion animals in general, along with the deep and affectionate bond Plaintiffs shared with their dog, it stands to reason that companion animals . . . could also be recognized, as a matter of common sense, as immediate family." 239 N.Y.S.3d at 790.

Following this analysis, however, the court adopted a narrow, fact-dependent rule: "A plaintiff who experiences emotional distress due to witnessing the death of a family pet in the zone of danger proximately caused by a defendant negligently operating a motor vehicle may file a claim for NIED if the pet was *leashed* to the plaintiff at the time the negligent act occurred and the plaintiff herself was exposed to danger." *Id.* at 791 (emphasis in original). Clarifying its rule further, the court stated, "the pet must have been tethered to the plaintiff—the pet was an extension of the human's presence at the site of the defendant's negligence." *Id.* The court's rule ultimately did not depend on the inclusion of household pets as members of the immediate family, but on the physical connection between the pet and plaintiff at the time of the injury. *See id.* at 792 (further clarifying that liability in the court's holding is "limited to a circumscribed set of facts where a negligent driver, as the operator of an instrument of harm, is to be found

responsible for infliction of emotional distress upon a person walking a leashed family dog in the zone of danger and viewing the horror of it being killed by the driver").

The court's holding in *DeBlase* does not support Plaintiffs' position. It adopts a narrow, fact-specific holding inapplicable to the circumstance of Sarabi's death. Nor does it cleanly hold that family pets are members of immediate family for the purposes of NIED—despite *Greene*'s holding that the definition of "immediate family" is not dependent on the facts of a particular case, the court in *DeBlase* cabined its holding to the facts at issue. Perhaps this arose in recognition of the contradictory result, adverse to the societal norms and common sense relied on by the Court of Appeals in *Greene*, that someone walking down the street with her niece could not recover under NIED if her niece was killed by a negligent driver, but someone walking down the street with her dog in the same circumstance could recover. *See Greene*, 168 N.E.3d at 835 (upholding its earlier decision in *Trombetta*). In applying New York law, the Court is required to follow the decision of lower New York courts only to the extent that the Court believes they accurately predict what the New York Court of Appeals would hold. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994) ("Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity."); *accord U.S. Specialty Ins. Co. v. Wesco Ins. Co.*, 529 F. Supp. 3d 251, 259 (S.D.N.Y. 2021). The Court does not find that the Court of Appeals would adopt the holding in *DeBlase*.

The loss of a pet, especially in such gruesome circumstances as those here, no doubt can be a profoundly distressing event. So too can be the loss of a cousin, a niece or nephew, a close personal friend, or a business associate. Courts must "limit the legal consequences of wrongs to a controllable degree." *Trombetta*, 626 N.E.2d at 656. New York's appellate courts have

repeatedly held that a pet is not a member of immediate family, and this Court cannot depart from that view. *See Kyprianides v. Warwick Valley Humane Soc'y*, 59 A.D.3d 600, 601 (2d Dep't 2009) ("New York law does not recognize a claim for negligent infliction of emotional distress for the loss of animals"); *Johnson v. Douglas*, 723 N.Y.S.2d 627, 628 (1st Dep't 2001) (dismissing plaintiff's NIED claim based on death of family dog and stating "zone of danger rule has only been applicable to the observance of the death or serious injury of an immediate family member who is a person"); *Fowler v. Ticonderoga*, 131 A.D.2d 919, 921 (3d Dep't 1987); *see also Entelisano v. Electrolux Home Prods., Inc.*, 2011 WL 572434, at *3 (N.D.N.Y. Feb. 15, 2011) (dismissing NIED claim and noting "[w]hile the loss of a pet can be an extremely sad event, it does not support a cause of action for accompanying emotional distress.").

Even if a claim for NIED could be premised on the death of a pet, Gomez has not alleged that she was threatened with physical harm or witnessed her cat's death from the "zone of danger." A plaintiff is within the "zone of danger" under a bystander theory of NIED where defendant's negligence "was a substantial factor in bringing about" the immediate family member's death or injury and "exposes a plaintiff to an unreasonable risk of bodily injury or death." *Bovsun v. Sanperi*, 461 N.E.2d 219, 230 (N.Y. 1982). In other words, plaintiff "must have 'contemporaneously witness[ed] the injury or death [of an immediate family member] and fear[ed] for [their] own safety as a result of being within the zone of danger created by defendant's negligence." *Morris v. Flaig*, 2005 WL 8157008, at *9 (E.D.N.Y. July 29, 2005) (quoting *Arroyo v. N.Y.C. Health and Hospitals Corp.*, 558 N.Y.S.2d 8, 9 (1st Dep't 1990)). Gomez argues that she was "within the zone of danger" because she was "personally exposed to the malfunctioning Autoscooper" and "forced to intervene," Dkt. No. 18 at 18, but her exposure to danger did not go beyond witnessing the mechanical movement of the machine and

28

unplugging it from the wall, Compl. ¶ 28 (noting that upon coming home and seeing the tragic incident, Gomez "quickly unplugged the device"). These allegations are insufficient to demonstrate a risk to her physical safety. *See Steinsnyder v. United States*, 2013 WL 1206451, at *8 (E.D.N.Y. Feb. 8, 2013), *report and recommendation adopted as modified*, 2013 WL 1209099 (E.D.N.Y. Mar. 25, 2013) (plaintiff was not in the zone of danger where son, who was following on a bicycle behind him, was hit by a USPS truck slowly turning right); *see id*. ("courts should examine the path of danger, and not merely the proximity of the resulting harm"); *DeAguiar v. Cnty. of Suffolk*, 734 N.Y.S.2d 212, 214 (2nd Dep't 2001) (plaintiff who viewed motorcycle accident from fifty to sixty yards away was not in the zone of danger); *Gonzalez v. N.Y.C. Housing Authority*, 580 N.Y.S.2d 760, (1st Dep't 1992) (plaintiff who was at the back of a malfunctioning elevator at the time it caused her daughter's death was not in zone of danger, despite her proximity to the accident). More fundamentally, at the time that the cat was killed, Gomez was away; she does not allege that she witnessed the cat's death. Compl. ¶ 28; *see In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, 450 F. Supp. 2d 432, 434 (S.D.N.Y. 2006) (plaintiffs did not state a NIED claim because "claimants were not in the zone of danger and did not witness from the zone of danger the death or serious physical injury of a family member."). Plaintiffs make no argument that Gueits was in the zone of danger. Dkt. No. 18 at 18–19; Compl. ¶¶ 166–180.

As Plaintiffs cannot state a claim for NIED based on the loss of their cat, their claim for NIED is dismissed with prejudice.

## III.     Motion to Dismiss Request for Non-Economic Damages, Attorneys' Fees, and Punitive Damages

"A motion to dismiss is addressed to a 'claim'—not to a form of damages." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010). Accordingly, some courts in

this Circuit decline to entertain motions to dismiss a request for relief.  *See, e.g., Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019); *Wiederman v. Spark Energy, Inc.*, 2020 WL 1862319, at *9 (S.D.N.Y. Nov. 16, 2017); *Am. Bldg. Maintenance Co. of N.Y. v. Acme Property Servs.*, 515 F. Supp. 2d 298, 324 (N.D.N.Y. 2007) (declining to dismiss requests for relief and noting that plaintiff "should be allowed to proceed on its properly-pleaded claims and develop the record more fully.").  Others dismiss requests for damages where they are unavailable as a matter of law.  *See Murtha v. N.Y. State Gaming Comm'n*, 2019 WL 4450687, at *19 (S.D.N.Y. Sept. 17, 2019) (dismissing demand for punitive damages where such damages are not available under the New York Human Rights Law); *Rosen v. N.Y.C. Dep't of Educ.*, 2019 WL 4039958, at *9 (S.D.N.Y. Aug. 27, 2019) (dismissing demand for punitive damages where such damages are not available under the Age Discrimination in Employment Act and the New York City Human Rights Law).

A motion to dismiss a request for relief is more appropriately treated as a motion to strike under Federal Rule of Civil Procedure 12(f).  *See Doe v. Indyke*, 457 F. Supp. 3d 278, 284 (S.D.N.Y. 2020) (treating a motion to dismiss punitive damages as a motion to strike).  Under Rule 12(f), a court may, on a motion or *sua sponte*, strike from a pleading an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f). Although motions to strike are "generally looked upon with disfavor," *Goetz v. Ainsworth Pet Nutrition, LLC*, 768 F. Supp. 3d 645, 651 (S.D.N.Y. 2025) (internal quotation marks and citation omitted), courts will strike requests for relief where they are unavailable as a matter of law.  *See Lax v. Monarch Life Ins. Co.*, 2024 WL 4528189, at *8 (S.D.N.Y. Oct. 18, 2024) ("Because attorneys' fees and punitive damages are not available in connection with Plaintiff's claims, the Court strikes Plaintiff's request for attorneys' fees and punitive damages"); *Frio Energy*

*Partners, LLC v. Finance Tech. Leverage,* LLC, 680 F. Supp. 3d 322, 352–54  (S.D.N.Y. 2023)

(striking request for punitive damages because unavailable as a matter of law without striking

request for attorneys' fees as premature); *Burlingame v. Martin*, 2022 WL 2315617, at *2

(N.D.N.Y. June 28, 2022) ("Because neither punitive nor emotional distress damages are

recoverable under the ADEA, the Court grants Defendants' motion to strike Plaintiff's request

for such damages under the ADEA"); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July

16, 2013) (striking Plaintiffs' request for compensatory damages for emotional injury where they

are unavailable as a matter of law).

The Court will treat the Moving Defendants' motion to dismiss Plaintiffs' request for

non-economic damages from the loss of their cat, attorneys' fees and costs, and punitive

damages as a motion to strike.

### A.    Claim for Non-Economic Damages

Moving Defendants argue that Plaintiffs' claim for damages based on loss of

companionship and emotional distress must be stricken as such damages are not available for the

loss of a pet under New York law.  Dkt. No. 14 at 12.  Plaintiffs acknowledge that pets are

considered personal property under New York law, such that damages beyond the economic

value of the pet are not available, but argue that "[i]t is both legally and morally indefensible to

continue classifying pets as mere property or 'chattel' in tort actions when, across multiple areas

of New York law, companion animals are increasingly recognized as sentient beings, family

members, and individuals worthy of legal protection in their own right."  Dkt. No. 18 at 19.

New York courts treat pets as personal property and consequently do not permit damages

for emotional distress or loss of companionship.  *See Schrage v. Hatzlacha*, 788 N.Y.S.2d 4 (1st

Dep't 2004) ("pets are treated under New York law as personal property, and the loss of a dog by

reason of negligence will not support claims by the animal's owners to recover for their resulting

emotional injury"); *DeJoy v. Niagara Mohawk Power Corp.*, 786 N.Y.S.2d 873, 873 (4th Dep't 2004) ("An animal owner in New York may not recover damages for loss of companionship, which we view here as legally equivalent to emotional distress, resulting from the death of an animal."); *Jason v. Parks,* 638 N.Y.S.2d 170, 171(2d Dep't 1996) ("It is well established that a pet owner in New York cannot recover damages for emotional distress caused by the negligent destruction of a dog."); *Fowler v. Town of Ticonderoga*, 516 N.Y.S.2d 368 (3d Dep't 1987) ("a dog is personal property and damages may not be recovered for mental distress caused by its malicious (i.e., intentional) or negligent destruction"). That limitation has been justified by the absence of a limiting principle. If a person could recover for emotional distress based on the loss of a family pet who is considered to be dear, someone could recover emotional distress damages for "the malicious or negligent destruction of other personal property; i.e., a family heirloom or prized school ring." *Johnson v. Douglas*, 723 N.Y.S.2d 627, 628 (Sup. Ct., Nassau Cty, 2001). New York courts also have expressed a concern that recognizing such relief "would place an unnecessary burden on the ever burgeoning caseloads of the court in resolving serious tort claims for injuries to individuals." *Id.* Acknowledging that pets occupy a different societal role than other forms of personal property, some county courts have allowed for a form of non-economic damages following the loss of a pet. *See, e.g., Brousseau v. Rosenthal*, 443 N.Y.S.2d 285, 285 (Sup. Ct., N.Y. Cnty. 1980) (evaluating the value of the loss of the dog's companionship as a factor in assessing the dog's value to the owner to calculate damages); *Corso v. Crawford Dog and Cat Hosp., Inc.*, 415 N.Y.S.2d 182, 183 (Sup. Ct., Queens Cnty. 1979) (awarding plaintiff damages for shock, mental anguish and despondency where plaintiff arranged an elaborate funeral for her dog and suffered mental distress when she only found the remains of a cat in her dog's casket); *see also Mercurio v. Weber*, 2003 WL 21497325, at *2 (N.Y. Dist. Ct. June 20,

2003) (adopting *Brousseau*'s assessment of damages for loss of pet). However, these cases have

been characterized as "aberrations flying in the face of overwhelming authority to the contrary."

*Gluckman v. Am. Airlines Inc.*, 844 F. Supp. 151, 158 (S.D.N.Y. 1994).

Even when pets are afforded greater protection than other forms of property under New

York law, they remain under the category of personal property. *See Feger v. Warwick Animal*

*Shelter*, 870 N.Y.S.2d 124, 126 (2d Dep't 2008) ("Companion animals are a special category of

property and are afforded many protections under the law."); Dom. Rel. L. § 236(B)(5)(d)(15)

(under the heading "disposition of property in certain matrimonial actions," instructing courts to

consider the best interest of companion animal in awarding possession of the animal).

Accordingly, and as Plaintiffs concede, New York law only permits damages for the loss of an

animal, as with other forms of personal property, in the amount of the economic value of the pet.

*See Lewis v. Di Donna*, 743 N.Y.S.2d 186, 189 (3d Dep't 2002) ("Pets are recognized as

personal property and damages for the loss of a pet are limited to the value of the pet at the time

it died."). The Court strikes Plaintiffs' request for damages for emotional distress and loss of

companionship, as such damages are unavailable as a matter of law.

### B.    Claim for Attorneys' Fees

Moving Defendants move to strike all claims for attorneys' fees and costs because

Plaintiff failed to cite the statute, court rule or agreement between the parties upon which it

relies, except with respect to Plaintiffs' claims under the GBL. Dkt. No. 14 at 13–14. In

opposition to Defendants' motion, Plaintiffs only pursue their claim for attorneys' fees with

respect to their claims under the GBL. Dkt. No. 18 at 21–22. All other claims for attorneys' fees

are deemed waived. *See Horsting v. St. John's Riverside Hospital*, 2018 WL 1918617, at *6

(S.D.N.Y. Apr. 18, 2018) ("At the motion to dismiss stage, where review is limited to the

pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support

33

of dismissing that claim." (quoting *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014))).  Because the Court has determined that Plaintiffs adequately state a claim under the GBL and both parties agree that attorneys' fees and costs are available under that statute, the Court denies Moving Defendants' motion with respect to attorneys' fees and costs under the GBL and grants Moving Defendants' motion with respect to Plaintiffs' remaining requests for attorneys' fees and costs.

### C.    Claim for Punitive Damages

Moving Defendants also argue that Plaintiffs' request for punitive damages should be stricken because they fail to allege nonconclusory facts to demonstrate that Moving Defendants' conduct rose to a high level of moral culpability.  Dkt. No. 14 at 14.  However, a plaintiff's request for punitive damages need not meet the pleading standards established in *Twombly* and *Iqbal*.  *See Amusement Indus.*, 693 F. Supp. 2d at 318 n.5 ("in rejecting attempts to dismiss demands for punitive damages, courts have not undertaken a detailed analysis of whether the factual allegations of the pleading support such a demand."); *Jing Wang v. Tesla, Inc.*, 2021 WL 3023088, at *5 (E.D.N.Y. July 16, 2021) (declining to address defendant's motion to dismiss punitive damages and noting "it is not even clear that there is a requirement that a complaint seeking punitive damages must plead specific facts that would support an award of such damages.").  A request for punitive damages is not a standalone claim for relief, but rather "is parasitic and possesses no viability absent its attachment to a substantive cause of action." *Buchanan for Buchanan v. Hesse*, 521 F. Supp. 3d 348, 357 (S.D.N.Y. 2021); *see also Fishberg v. State Farm Fire & Cas. Co.*, 2021 WL 3077478, at *5 (S.D.N.Y. July 20, 2021) ("New York does not provide an independent cause of action for punitive damages").  The Court only assesses whether punitive damages are available as a matter of law.

Plaintiffs seek punitive damages pursuant to their strict products liability and GBL claims due to Defendants' conduct in "knowingly placing a defectively designed and dangerously inadequate product into the stream of commerce, despite clear and foreseeable risks of fatal injury." Compl. ¶ 165; *see id.* ¶¶ 92, 119, 144 (same). Plaintiffs argue that such damages are needed "to punish such callous disregard and to deter similar future misconduct in the manufacture and sale of pet safety products." *Id.*

Punitive damages are available under New York common law if the plaintiff can show "willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard." *Chauca v. Abraham*, 89 N.E.3d 475, 477 (N.Y. 2017); *see also Cohen v. Davis*, 926 F. Supp. 399, 405 (S.D.N.Y. 1996) (a plaintiff may recover punitive damages for tortious conduct which involves "gross, wanton, or willful fraud or other morally culpable conduct." (quoting *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991))). There is no bar to punitive damages for strict products liability claims. *See Home Ins. Co. v. Am. Home Prods. Corp.*, 550 N.E.2d 930, 935 (N.Y. 1990) (punitive damages are available for a strict products liability case for failure to warn); *O'Neill v. Yield House Inc.*, 892 F. Supp. 76, 78 (S.D.N.Y. 1995) ("[P]unitive damages are appropriate in products liability cases where acts of defendant causing the injury were wanton or reckless (citing *Racich v. Celotex*, 887 F.2d 393, 396 (2d Cir. 1989))); *see also James v. Lan-O-Tone Prods., Inc.*, 1989 WL 61852, at *4 (S.D.N.Y. June 7, 1989) (allegation that product was dangerous sufficient to maintain request for punitive damages at pleading stage). The New York Court of Appeals has held that punitive damages are available under GBL § 349(h), *Karlin v. IVF Am., Inc.*, 712 N.E.2d 662, 666 (N.Y. 1999), and GBL § 350-e provides for the same forms of damages, N.Y. Gen. Bus. L. § 350-e. *See also In re Scotts EZ Seed Litigation*, 304 F.R.D. 397, 415 (S.D.N.Y.

2015) (noting the availability of punitive damages).  The "decision to award punitive damages and their amount are questions which primarily reside in the jury's discretion."  *Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir. 1989); *see also O'Neil v. Argon Med. Devices, Inc.*, 2020 WL 1149904, at *11 (N.D.N.Y. Feb. 13, 2020), *report and recommendation adopted*, 2020 WL 1140511 (N.D.N.Y. Mar. 9, 2020) ("[W]hether or not to award punitive damages is a fact-intensive inquiry not necessarily appropriate on a motion to dismiss").

Defendants have not shown that punitive damages are unavailable as a matter of law. The Court thus denies Defendants' motion to strike Plaintiffs' request for punitive damages.

## CONCLUSION

Moving Defendants' motion to dismiss Plaintiffs' claims against the Individual Defendants for lack of personal jurisdiction is GRANTED.

Moving Defendants' motion to dismiss Plaintiffs' claim for NIED and to strike Plaintiffs' request for damages due to emotional distress and loss of companionship is GRANTED.

Moving Defendants' motion to dismiss Plaintiffs' claims under the GBL and to strike Plaintiffs' request for attorneys' fees with respect to claims under the GBL and punitive damages is DENIED.  Moving Defendants' motion to strike Plaintiffs' request for attorneys' fees under the remaining claims is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 14.

SO ORDERED.

Dated: February 24, 2026
       New York, New York

_____
            LEWIS J. LIMAN
       United States District Judge

36